## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **Brian Gannon,** | | **CASE NO. 1:21cv601** |
| | **Plaintiff,** | |
| **-vs-** | | **JUDGE PAMELA A. BARKER** |
| **Medina Township, et al.,** | | |
| | **Defendants.** | **MEMORANDUM OF OPINION AND ORDER** |

Currently pending are (1) the Motion for Summary Judgment of Defendants Montville Township and Ryan Gibbons (hereinafter "the Montville Township Defendants") (Doc. No. 23); and (2) the Motion for Summary Judgment of Defendants Medina Township, Morley Brenenstuhl, and Justin Harvey (hereinafter "the Medina Township Defendants") (Doc. No. 27.) Plaintiff Brian Gannon filed briefs in opposition on March 7, 2022, to which the Defendants filed replies on March 15 and 21, respectively.  (Doc. Nos. 30, 31, 32, 33.)

For the following reasons, the Montville Township Defendants' Motion for Summary Judgment (Doc. No. 23) is GRANTED.  The Medina Township Defendants' Motion for Summary Judgment (Doc. No. 27) is GRANTED.

I.   **Background**

    A.   **Factual Background**

This case arises out of a traffic stop of a vehicle that was being operated by Plaintiff Brian Gannon on March 16, 2019 in Medina Township, Ohio. [1] At approximately 11:32 p.m. that night, Defendant Medina Township Police Officer Morley Brenenstuhl ran the license plate of a vehicle exiting a gas station on Medina Road.  (Doc. No. 27-1 at PageID# 195.)  The search revealed that the plate was issued to a Roxanne Gannon and that the vehicle (a 2008 Pontiac) was registered as stolen. (*Id*.)  *See also* Gibbons Aff. (Doc. No. 23-1) at ¶¶ 12, 14-15.  After confirming with dispatch that the vehicle was, in fact, stolen, Officer Brenenstuhl followed it to the I-71 southbound ramp off Medina Road and activated his flashing lights and siren.  (Doc. No. 27-1 at PageID# 195.)  Gannon pulled to the side of the ramp and stopped the vehicle.  (*Id*.)

Defendant Medina Township Police Officer Justin Harvey responded as back-up.  (*Id*.)  In his Supplemental Police Report, Officer Harvey states that he reviewed the stolen vehicle report associated with the 2008 Pontiac and that the report identified Brian Gannon as a suspect.  (Doc. No.

---

[1] The Court considered the following evidence in resolving the instant Motions. Video footage was submitted by both the Medina Township Defendants and the Montville Township Defendants regarding the traffic stop in question. Specifically, Medina Township Police Officer Brenenstuhl was wearing a body camera that recorded the March 16, 2019 traffic stop.  A camera mounted on the dashboard of a Montville Township Police Department cruiser also captured the incident in question. Where police dash-cam videos depict genuinely disputed facts, "we 'view [ ] the facts in the light depicted by the videotape[s]." *Rudlaff v. Gillispie*, 791 F.3d 638, 638 (6th Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 381 (2007)).  In addition, although none of the law enforcement officers that responded to the scene were deposed in this case, Officer Gibbons provided an Affidavit in support of the Montville Township Defendants' summary judgment motion, which was considered by this Court. (Doc. No. 23-1.) In addition, the Court considered the Medina Township Police Report regarding the March 16, 2019 incident, which was authenticated via an affidavit submitted by Officer Brenenstuhl.  (Doc. No. 27-1.)  Although Gannon was deposed in this matter, he testified that he was extremely intoxicated at the time of the March 16, 2019 traffic stop and has no independent recollection of the events in question. (Gannon Depo. (Doc. No. 23-4) at Tr. 31-33.)  Lastly, the Court notes that, although a jury trial was conducted in state court regarding the charges arising from the instant traffic stop (at which both Defendant Brenenstuhl and Defendant Gibbons apparently testified), the parties did not submit any of the trial testimony in Gibbons' criminal case in the instant matter.  Thus, the Court did not review any of the testimony or evidence introduced in Gibbons' criminal case in resolving the instant motions.

27-1 at PageID# 196.)  Officer Harvey pulled up a photo of Gannon in his patrol car and determined that "the person in the vehicle matched the picture that I had in my patrol car." (*Id*.)

Officer Brenenstuhl states that, because the vehicle was registered as stolen, he "drew [his] issued Glock 17 firearm and pointed it in the direction of the vehicle."[2]  (Doc. No. 27-1 at PageID# 195.)  Video footage of the traffic stop shows that Officer Brenenstuhl then repeatedly ordered Gannon to turn the vehicle off and put the keys on the roof.  (Doc. No. 28 (hereinafter "Brenenstuhl Video" at 00:35 to 1:00.)  Gannon eventually turned off the car and threw the keys out of the driver's side window, where they landed on the ground.  (Doc. No. 27-1 at PageID# 195.)

The Medina Township officers requested assistance from the Montville Township Police Department.  (*Id*.)  Approximately two to three minutes after the traffic stop was initiated, Defendant Ryan Gibbons, a Montville Township Police Officer and certified canine handler, responded to the scene, along with his canine, Blek.[3]  (Gibbons Aff. (Doc. No. 23-1) at ¶¶ 1-3, 11.)  Officer Gibbons avers that, shortly after arriving, he was advised by Officer Harvey that the vehicle had been reported as stolen.  (*Id*. at ¶ 14.)  Officer Gibbons also avers that another officer (identified as Officer Schmoll) advised him that Gannon was "wanted on a warrant out of Ashland County for felony domestic violence and for forcibly taking the vehicle from its owner." (*Id*. at ¶ 15.)  Officer Gibbons further

---

[2] The video footage does not clearly show Officer Brenenstuhl pointing his gun at the vehicle.  However, Officer Brenenstuhl states that he did so in his police report and Gannon does not dispute that this occurred.

[3] Officer Gibbons avers that he and Blek responded to the scene in response to a request from Medina Township law enforcement for assistance. (Gibbons Aff. (Doc. No. 23-1) at ¶ 11.)  The Montville Township Defendants submitted evidence that Officer Gibbons and Blek have received multiple certifications from the Ohio Peace Officer Training Commission, Professional Standards Division of the Ohio Attorney's General Office, and North American Police Work Dog Association between May 2015 and March 2019. (*Id*. at ¶ 3-6.)  These certifications were for criminal apprehension, canine control/handling, canine searches, and obedience (including aggression control).  (*Id*.)

avers that he was told that Gannon was the subject of a BOLO (i.e., "be on the lookout") that was put out by Ashland County. (*Id.*)

Meanwhile, Officer Brenenstuhl instructed Gannon to step out of the vehicle and put his hands on his head. (Brenenstuhl Video at 1:13.) Gannon failed to comply. (*Id.*) Officer Brenenstuhl (along with several other law enforcement officers) continued to instruct Gannon to step out of the vehicle, repeating that command at least six times. (*Id.* at 1:13 to 2:25.) Gannon continued to refuse to comply. (*Id.*) Officer Brenenstuhl advised Gannon that the officers were not going to leave until he got out of the vehicle. (Brenenstuhl Video at 3:49.) Gannon told the officers to "go f*** yourself." (*Id.* at 3:50.)

At this point, Officer Gibbons put Blek on a 30-foot lead and approached the vehicle so that Gannon could see Blek. (Doc. No. 26 (hereinafter "Montville Video") at 2:50.) Officer Gibbons advised Gannon repeatedly that he needed to exit the vehicle or the canine would be deployed and he would be bitten. (Gibbons Aff. at ¶ 16.) *See also* Brenenstuhl Video at 5:26 to 7:40; Montville Video" at 2:50. Indeed, the video footage shows that Officer Gibbons expressly told Gannon at least nine times to "exit the vehicle or you will get bit." (Brenenstuhl Video at 5:18 to 7:19.) Gannon refused to comply and gave officers the middle finger. (Gibbons Aff. at ¶¶ 17, 18.)

At this point, Officer Gibbons deployed Blek and gave him the command to bite Gannon. (*Id.* at ¶ 19.) *See also* Montville Video at 5:20. The video footage is not entirely clear but it appears that, at this time, all of Gannon's vehicle doors (including the driver's side door) were closed while the driver's side window was open. (Montville Video at 5:20 to 6:45.) Officer Gibbons can be heard giving various dog commands and Blek can be heard barking. (*Id.*) The Montville Video footage shows Blek repeatedly approaching the driver side of the vehicle and jumping towards the driver's

4

side window.  (*Id*.)  However, Blek was unable to reach Gannon, apparently due to his inability to get into the open car window.  (*Id*.)  *See also* Gibbons Aff. at ¶ 19.

By this time, Gannon had been refusing to exit the vehicle for approximately twelve minutes. The officers decided to approach the vehicle from both sides.  Officer Gibbons and Blek approached the driver's side of the vehicle, along with several officers who were behind a ballistic shield. (Gibbons Aff. at ¶ 20.)  *See also* Doc. No. 27-1 at PageID# 196.  Officers Brenenstuhl and Harvey approached the passenger side "to provide cover." (Doc. No. 27-1 at PageID#195.)  Multiple voices can be heard telling Gannon to "get out of the car, get out of the car." (Brenenstuhl Video at 12:16-12:18; Montville Video at10:06.)

Neither of the video recordings clearly show the officers' efforts to extract Gannon from the vehicle nor does either recording clearly show what either Gannon or Blek are doing during this extraction process.  The Montville Video shows an officer (apparently Officer Gibbons) open the driver's door and multiple officers clustered around and reaching into the driver's door.  (Montville Video at 9:28.)  According to the video recordings, it took approximately sixteen to twenty seconds to get Gannon out of the vehicle and onto the ground.  (Brenenstuhl Video at 12:16 to 12:32; Montville Video from 10:06 to 10: 24.)  Blek cannot be clearly seen in either video recording.

As noted *supra*, Gannon has no memory of the incident.  Officer Gibbons, however, submitted an Affidavit regarding his and Blek's roles in extracting Gannon from the vehicle.  According to Officer Gibbons, he opened the driver's side door, gave Blek the command to bite Gannon, and physically attempted to pull Gannon out of the vehicle.  (Gibbons Aff. at ¶ 21.)  Blek bit Gannon in his left thigh while Officer Gibbons attempted to pull Gannon out of the vehicle by his left arm.  (*Id*. at ¶ 22.)  Gannon continued to refuse to exit the vehicle, holding on to the interior of the vehicle with

5

his right hand.  (*Id*. at ¶ 23.)  According to Officer Gibbons, Gannon was resisting and trying to push his (i.e., Gibbons') hands away.  (*Id*. at ¶ 24.)  Officer Harvey also stated in his police report that Gannon "resisted and held onto the steering wheel refusing to get out of the vehicle."  (Doc. No. 27-1 at PageID# 196.)  Officer Gibbons grabbed Gannon's left arm with his left hand, grabbed Gannon's hair with his right hand, and pulled him out of the vehicle and onto the ground.  (Gibbons Aff. at ¶ 24.)

The Montville Video shows Gannon on the ground surrounded by several officers, but neither recording clearly shows what either Gannon or Blek are doing while Gannon is on the ground. According to Officer Gibbons, when Gannon came out of the vehicle, he fell on top of Blek.  (*Id*. at ¶ 25.)  Blek lost his grip on Gannon's left thigh and bit Gannon on his right thigh.  (*Id*.)  *See also* Doc. No. 27-1 at PageID# 195.  After ensuring that there were no other individuals in the vehicle, Officer Brenenstuhl assisted the other officers' efforts to handcuff Gannon.  (Doc. No. 27-1 at PageID# 195.)  Officer Brenenstuhl can be heard saying "stop fighting" and "don't resist." (Brenenstuhl Video at 12:36, 12:42.)  In his police report, Brenenstuhl states that he placed his knee and hands on Gannon's legs "to prevent him from kicking" and ordered Gannon "not to resist and not to fight, to which he complied."  (Doc. No. 27-1 at PageID# 195.)  At some point, the other officers succeeded in placing Gannon in handcuffs.  (*Id*.)  When he "was advised that Mr. Gannon was secured in handcuffs by the other officers and no longer resisting," Officer Gibbons "put a positive control on Blek's collar and conducted a lift off of the bite."[4]  (Gibbons Aff. at ¶ 26.)  Officer Gibbons then placed Blek in a patrol car.  (*Id*. at ¶ 27.)

---

[4]  It is not entirely clear exactly how long Blek retained his hold on Gannon's right thigh after Gannon was handcuffed. In the Brenenstuhl Video: (1) Brenensthul can be heard saying "stop fighting" at the 12:36 minute mark and "don't resist" at 12:42; (2) another officer can be heard saying "get the dog" at the 12:44 minute mark; (3) someone (presumably

The video footage shows that Gannon remained laying on the ground after he was handcuffed. One of the officers can be heard reading Gannon his Miranda rights.  (Brenenstuhl Video at 14:56.) The officer asked Gannon if he understood, to which Gannon replied "yes." (*Id*.) Officer Brenenstuhl retrieved a medic kit from his patrol car and assisted one of the Deputies in rendering first aid to Gannon's legs.  (Doc. No. 27-1 at PageID# 195.)  An ambulance was called and arrived approximately ten to eleven minutes after Gannon was removed from the vehicle. (*Id*.) While waiting for the ambulance, Officer Brenenstuhl asked Gannon his name and where he was from, to which Gannon responded "Brian Gannon" and "Ashland."  (Brenenstuhl Video at 15:11-16:18.)  Officer Brenenstuhl also asked Gannon why he would not come out of his car, to which Gannon replied "go f*** yourself." (*Id*. at 20:11.)  A search of Gannon's vehicle revealed several dollar bills and an open container of alcohol.  (Doc. No. 27-1 at PageID# 195-196.)  No weapons or contraband were found in Gannon's possession.  (*Id*.)

Officer Brenenstuhl accompanied Gannon to Medina Hospital, where he was treated for dog bites.  (*Id*. at PageID# 195.)  According to the police report, Gannon received stitches for the dog bite on his left leg but his right leg "did not require treatment or stitches."  (*Id*.)  Gannon was discharged from the hospital.  (*Id*.)  Officer Brenenstuhl advised Gannon of his Miranda rights, told him that he

---

Gibbons) replies "I got the dog" at 12:50; and (4) another officer states "secured" at 13:09.  Twenty seconds later, at the 13:29 minute mark, Officer Gibbons can be heard giving a command to Blek, apparently in a foreign language.  It is not clear from the Brenenstuhl Video when Gibbons took Blek back to the patrol car.  In the Montville Video, the most that can be determined is that Gannon was on the ground at the 10:22 minute mark and Officer Gibbons walked Blek back to the patrol car at approximately the 11:50 minute mark.

was being charged with Obstructing Official Business,[5] and transported him to the Medina County Jail.  (*Id*.)

As a result of the above incident, Gannon was indicted in the Medina County Court of Common Pleas on one count of Obstructing Official Business in violation of Ohio Rev. Code § 2921.31(A)(B), a felony of the fifth degree.  *See State v. Gannon*, Medina County Ct. Cmn. Pl. Case No. 19CR0328 (docket sheet).  Gannon pled not guilty on April 11, 2019.  (*Id*.)  A jury trial was held in June 2019, after which Gannon was found guilty.  (*Id*.)  In addition, the jury made an additional finding that Gannon created a risk of physical harm in the commission of the offense.  (*Id*.)  Gannon was sentenced to a 180-day term of incarceration, with credit for 95 days served.  (*Id*.)  Gannon's conviction and sentence were affirmed on appeal.[6]  *See State v. Gannon*, 2020 WL 2651305 (Ohio App. 9th Dist. May 26, 2020).[7]

## B.    Procedural History

---

[5] The Medina Township Police Report relating to this incident lists the following offenses: (1) Obstructing Official Business (Ohio Rev. Code § 2921.31); (2) Resisting Arrest (Ohio Rev. Code § 2921.33A); and (3) Driving under OVI Court Ordered Suspension (Ohio Rev. Code § 4510.14A).

[6] In addition, Officer Gibbons avers that "the deployment of Blek in the apprehension of the plaintiff was investigated and found to be consistent with Departmental policy."  (Gibbons Aff. at ¶ 33.)  Section 309.5 of the Montville Police Department policy manual provides that: "A canine may be used to locate and apprehend a suspect if the canine handler reasonably believes that the individual has committed, is committing, or is threatening to commit any serious offense and if any of the following conditions exist: (a). There is a reasonable belief the suspect poses an imminent threat of violence or serious harm to the public, any officer, or the handler.  (b). The suspect is physically resisting or threatening to resist arrest and the use of a canine reasonably appears to be necessary to overcome such resistance. (c). The suspect is believed to be concealed in an area where entry by other than the canine would pose a threat to the safety of the officers or the public."  (Doc. No. 23-2 at PageID# 113.)  The canine officer should provide a "clearly audible warning announcing that a canine will be used if the suspect does not surrender."  (*Id*. at PageID# 114.) In addition, the policy provides that "If the canine has apprehended a suspect with a secure bite, and the handler believes that the suspect no longer poses a threat, the handler should promptly command the canine to release the suspect." (*Id*.)

[7] The Court also notes that, on January 13, 2020, Gannon pled guilty in the Ashland County Court of Common Pleas to felonious assault, domestic violence, and grand theft of a motor vehicle.  *See State v. Gannon*, Ashland Cty. Ct. Cmn. Pl. Case No. 19-CRI-076.  These charges stemmed from Gannon's "vicious assault" on his elderly mother and theft of the 2008 Pontiac.  *See State v. Gannon*, 2021 WL 672519 (Ohio App. 5th Dist. Feb. 19, 2021).  Gannon was sentenced to seven years in prison for these offenses.  The state appellate court upheld his conviction and sentence on appeal.  *Id.*

8

On March 15, 2021, Gannon filed a Complaint in this Court against Defendants Montville Township, Medina Township, and Officers Gibbons, Brenenstuhl, and Harvey.  (Doc. No. 1.) Therein, Gannon alleges the following claims: (1) intentional infliction of emotional distress (Count I); (2) excessive force and Monell claims under 42 U.S.C. § 1983 (Count II); and (3) assault and battery (Count III).  (*Id.*)  The Montville Township Defendants and Medina Township Defendants filed separate Answers in April 2021.  (Doc. Nos. 6, 7.)

The Montville Township and Medina Township Defendants each filed Motions for Summary Judgment on January 14, 2022.  (Doc. Nos. 23, 27.)  Gannon filed Briefs in Opposition on March 7, 2022.  (Doc. Nos. 30, 31.)  The Montville Township Defendants filed a Reply on March 15, 2021, and the Medina Township Defendants filed a Reply on March 21, 2022.  (Doc. Nos. 32, 33.)

## II.  Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party."  *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006).  "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law."  *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party."  *Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d

619, 628 (6th Cir. 2018).  In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 Fed. Appx 506, 508 (6th Cir. 2014).  The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 Fed. Appx 758, 764 (6th Cir. 2008).  "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'"  *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial."  *Ask Chems.*, 593 Fed. Appx at 508-09.  "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'"  *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp. 3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

## III.  Federal Claims

### A.  Section 1983 Claims against the Montville Township Defendants

#### 1.  Excessive Force

In Count II of his Complaint, Gannon asserts a claim under 42 U.S.C. § 1983 that Officer Gibbons violated his rights under the Fourth and Fourteenth Amendments to be free from excessive force.  (Doc. No. 1 at ¶ 22.)  Gannon alleges that Officer Gibbons "either deliberately set Blek on the helpless Plaintiff or in the alternative was negligent in the handling of Blek while Plaintiff was in the control and custody of the officers." (*Id.* at ¶ 12.)

10

The Montville Township Defendants move for summary judgment in their favor with respect to this claim.  (Doc. No. 23.)  Defendants argue that Officer Gibbons is entitled to qualified immunity because (1) his actions did not violate Gannon's constitutional right to be free from excessive force, and (2) it was not clearly established at the time of the incident that Officer Gibbons' actions would violate Gannon's rights. [8] (*Id.* at p. 7- 14.)  Gannon argues that there is a genuine issue of material fact regarding whether Officer Gibbons' use of force was reasonable under the circumstances.  (Doc. No. 30.)

To maintain a claim under 42 U.S.C. § 1983, a plaintiff must establish that he was deprived of a right secured by the Constitution or the laws of the United States, and that the deprivation was caused by a person acting under color of state law.  *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Simescu v. Emmet Cty. Dep't of Soc. Services*, 942 F.2d 372, 374 (6th Cir. 1991).  Here, there is no dispute that Officer Gibbons acted under color of state law.  As such, the only remaining question is whether Gannon was deprived of a right secured by the Constitution or the laws of the United States.

However, "[p]olice officers are immune from civil liability unless, in the course of performing their discretionary functions, they violate the plaintiff's clearly established constitutional rights." *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015).  To determine whether an officer is entitled to qualified immunity, courts "apply a well-established two-prong test: (1) whether the facts, when taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right; and (2) whether the right violated was clearly established such that a reasonable official would understand that what he is doing violates that right." *Id.*  These steps may be addressed

---

[8] The Court notes that neither the Montville Township Defendants nor the Medina Township Defendants argue that Gannon's excessive force claims are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994).  The Court therefore does not consider or address this issue.

in any order, and the defendant officer need only prevail on one of them to be granted qualified immunity.  *See Coffey v. Carroll*, 933 F.3d 577, 584 (6th Cir. 2019); *Maben v. Thelen*, 887 F.3d 252, 269 (6th Cir. 2018).

With regard to the second step, "clearly established" means that the law is so clear at the time of the incident that every reasonable officer would understand the unlawfulness of his conduct. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018).  As the Supreme Court recently explained:

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent.  The rule must be "settled law," *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (*per curiam* ), which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority,' " *al–Kidd, supra*, at 741–742, 131 S.Ct. 2074 (quoting *Wilson v. Layne*, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)).  It is not enough that the rule is suggested by then-existing precedent.  The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.  *See Reichle*, 566 U.S., at 666, 132 S.Ct. 2088.  Otherwise, the rule is not one that "every reasonable official" would know.  *Id.*, at 664, 132 S.Ct. 2088 (internal quotation marks omitted).
>
> The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him.  The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).  This requires a high "degree of specificity." *Mullenix v. Luna*, 577 U.S. ----, ----, 136 S.Ct. 305, 309, 193 L.Ed.2d 255 (2015) (*per curiam* ). We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff, supra*, at 2023 (internal quotation marks and citation omitted).  A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established." *Anderson, supra*, at 641, 107 S.Ct. 3034.

*Id.* at 589-90.  Thus, in evaluating whether a constitutional right was clearly established for purposes of qualified immunity, courts "must examine the *particular* situation that [the defendant officers]

confronted and ask whether the law clearly established that their conduct was unlawful." *Howse v. Hodous*, 953 F.3d 402, 407 (6th Cir. 2020).

### a. Violation of a Constitutional Right

Gannon claims that Officer Gibbons used excessive force in effectuating his arrest in violation of the Fourth and Fourteenth Amendments. [9] "An excessive-force claim turns on whether an officer's actions were 'objectively reasonable' given the circumstances he confronted." *Shanaberg v. Licking Cty.*, 936 F.3d 453, 455–56 (6th Cir. 2019) (quoting *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). *See also Zuress v. City of Newark, Ohio*, 815 Fed. Appx. 1, 4-5 (6th Cir. 2020). This is an objective inquiry, in which courts "ask how a reasonable officer would have seen things in the heat of the moment, not in hindsight." *Id. See also Shanaberg*, 936 F.3d at 456; *Hammond v. County of Oakland, Michigan*, 825 Fed. Appx. 344, 346 (6th Cir. 2020) ("We analyze that claim based on 'the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'") (quoting *Hayden v. Green*, 640 F.3d 150, 153 (6th Cir. 2011)).

---

[9] As the Sixth Circuit has explained: "An excessive-force claim may arise under the Fourth, Eighth, or Fourteenth Amendments. While the Fourth Amendment's prohibition against unreasonable seizures bars excessive force against free citizens, the Eighth Amendment's ban on cruel and unusual punishment bars excessive force against convicted persons. When an individual does not clearly fall within either category, the Fourteenth Amendment's Due Process Clause prohibits a governmental official's excessive use of force." *Hopper v. Phil Plummer*, 887 F.3d 744, 751 (6th Cir. 2018) (internal citations omitted). Excessive force claims under the Fourth and Fourteenth Amendments are both evaluated under an objective reasonableness standard. *See Hopper*, 887 F.3d at 752. *See also Kingsley v. Henrickson*, 135 S.Ct. 2466, 2472-2473 (2015) (holding in § 1983 suit brought by a pretrial detainee alleging a violation of the Fourteenth Amendment that, in determining "whether force deliberately used is, constitutionally speaking, 'excessive,' " ... courts must use an objective standard; thus "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable."); *Graham*, 490 U.S. at 397 (the "reasonableness" inquiry in excessive force claim brought under the Fourth Amendment "is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."). Here, it is not clear to this Court that any aspect of Gannon's excessive force claim arises under the Fourteenth Amendment. However, as both Fourth and Fourteenth Amendment excessive force claims are evaluated under an objective reasonableness standard, the Court need not decide this issue.

To answer this question, courts consider the following factors from *Graham v. Connor, supra* (the "*Graham* factors"): "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.  Where "a plaintiff claims that excessive force was used multiple times, the court must segment the incident into its constituent parts and consider the officer's entitlement to qualified immunity at each stop along the way." *Wright v. City of Euclid*, 962 F.3d 852, 865 (6th Cir. 2020).  *See also Hammond*, 825 Fed. Appx. at 346.  The "overarching determination" a court must make, however, "is whether the 'totality of the circumstances' justified the degree of force an officer used." *Shanaberg*, 936 F.3d at 456 (citation omitted).

As the Sixth Circuit recently noted, "the law in our circuit with respect to excessive-force claims involving canine seizures is clearly established at the outer bounds. On one end of the spectrum, 'we have held that officers cannot 'use[ ] an inadequately trained canine, without warning, to apprehend two suspects who were not fleeing.'" *Baxter v. Bracey*, 751 Fed. Appx. 869, 872 (6th Cir. 2018) (alterations in original) (quoting *Campbell v. City of Springboro*, 700 F.3d 779, 789 (6th Cir. 2012)).  On the other end, "we have upheld the use of a well-trained canine to apprehend a fleeing suspect in a dark and unfamiliar location." *Baxter*, 751 Fed. Appx. at 872 (citing *Robinette v. Barnes*, 854 F.2d 909, 913–14 (6th Cir. 1988)).  "These cases and their progeny establish guidance on the ends of the spectrum, but the middle ground between the two proves much hazier." *Baxter*, 751 Fed. Appx. at 872.  *See also Burgess v. Bowers*, 773 Fed. Appx. 238, 246 (6th Cir. 2019) (same).

Here, the Montville Township Defendants argue that there is no genuine issue of material fact that Officer Gibbons' use of force was objectively reasonable and that no constitutional violation occurred.  Defendants emphasize that, at the time of the stop, Officer Gibbons had been advised that

14

(1) the vehicle was stolen; (2) an arrest warrant had been issued for Gannon for felony domestic violence; and (3) Gannon was the subject of a BOLO.  (Doc. No. 23 at p. 11.)  Defendants note that Officer Gibbons repeatedly asked Gannon to exit the vehicle and expressly warned him that, if he failed to do so, Blek would be deployed and Gannon would "get bit."  (*Id.* at pp. 11-12.)  Defendants assert that Gannon chose not to comply and, as a result, "his immediate future transpired precisely as Officer Gibbons predicted in his warning."  (*Id.* at p. 14.)  In light of the above, Defendants argue that Officer Gibbons is entitled to qualified immunity because the "the totality of the circumstances and the information within Officer Gibbons' knowledge at the time he released Blek suggest that his actions were reasonable . . . and necessary to obtain the goal of successfully apprehending a violent and resistant suspect, like plaintiff."  (*Id.* at p. 13.)

In response, Gannon argues that he was "subjected to a level of excessive/gratuitous force that shocks the conscience of society."  (Doc. No. 30 at p. 2.)  He maintains that the level of force used by Officer Gibbons in releasing Blek was not reasonable because "Plaintiff did not commit an aggressive act; did not demonstrate an act of force; did not possess a deadly weapon; [and] did not brandish a deadly weapon or make any verbal threats."  (*Id.* at p. 9.)  Rather, Gannon asserts that he was "helpless" and merely noncompliant with orders from the officers.  (*Id.*)  As such, Gannon argues, he was only "passively resisting" and Officer Gibbons' actions were excessive and unwarranted under the circumstances.  (*Id.* at pp. 8-9.)  Gannon does not direct this Court's attention to any evidence to support these assertions.

At the outset, the Court notes that it is not clear whether Gannon is challenging (1) Officer Gibbons' use of Blek to remove him from the vehicle; and/or (2) Officer Gibbons' failure to prevent Blek from continuing to bite him once he was out of the vehicle and on the ground.  Construing

Gannon's filings liberally, the Court will assume that Gannon is raising both issues and address them separately, below.

### i. Decision to Deploy Blek to Remove Gannon from the Vehicle

The Court finds that Officer Gibbons' decision to use Blek to remove Gannon from the vehicle was objectively reasonable.  With regard to the *Graham* factors, the first -- the severity of the crime -- weighs in favor of Officer Gibbons.  It is undisputed that, at the time of the traffic stop, Gannon was driving a stolen vehicle, wanted for felony domestic violence, and the subject of a law enforcement BOLO.  Officer Gibbons avers (and Gannon does not contest) that he was advised of these facts by Medina Township Officers Harvey and Schmoll at the scene. Both the domestic violence and grand theft of a motor vehicle offenses are felonies under Ohio law.[10]  Gannon does not argue that these offenses would not be considered severe or that the first *Graham* factor would otherwise weigh in his favor.  The Court finds that a reasonable officer would consider these alleged offenses to be serious (and, in the case of felony domestic violence, violent) crimes and associated with an increased risk of danger.  *See, e.g., Robinette*, 854 F.2d at 913-914 (finding officer's use of canine reasonable where defendant was a "suspected felon" at the time of arrest).

The Court also finds that the immediate threat factor weighs in Officer Gibbons' favor.   As discussed above, the officers were aware that Gannon was driving a stolen vehicle and wanted on felony charges.  It was dark and the officers could not determine whether Gannon was alone in the

---

[10] Under Ohio Rev. Code § 2913.02 ("Theft; aggravated theft"), "if the property stolen is a motor vehicle, a violation of this section is grand theft of a motor vehicle, a felony of the fourth degree." Ohio Rev. Code § 2913.02(B)(5).  In addition, while domestic violence can be either a misdemeanor or felony under Ohio Rev. Code § 2919.25, Officer Gibbons avers that he was advised that Gannon was wanted on an arrest warrant for felony domestic violence.  A review of the state court proceedings indicates that Gannon was subsequently indicted for, and pled guilty to, a third-degree felony charge of domestic violence.  *See Gannon*, 2021 WL 672519 at * 1.

vehicle.  Nor could the officers determine if Gannon and/or any other possible occupants of the vehicle were armed.  Gannon was verbally hostile to the officers and refused to respond to the officers' repeated commands to exit the vehicle.  In other words, Gannon was "an unknown quantity and act[ing] unpredictably." *Zuress*, 815 Fed. Appx. at 5.  Under similar circumstances, courts have found that this factor weighs in favor of the use of a police dog to effectuate an arrest.  *See, e.g., Zuress*, 815 Fed. Appx. at 5 (in canine excessive force case, finding immediate threat factor weighed in officer's favor where it was unknown whether plaintiff was alone or armed and plaintiff was not complying with the officers' commands); *Ashford v. Raby,* 951 F.3d 798, 802 (6th Cir. 2020) (in canine excessive force case, finding use of police dog reasonable where plaintiff repeatedly refused commands to exit vehicle and it was not clear whether he was alone in the vehicle); *Burgess*, 773 Fed. Appx. at 246 (in canine excessive force case, finding use of police dog reasonable where defendant was hiding in crawlspace, refused to come out, and officers could not determine if he was armed).

Gannon argues that this factor is not met because he was "helpless" and unarmed.  However, a reasonable officer would not have known that Gannon was unarmed.  *See Zuress*, 815 Fed. Appx. at * 5 ("Plaintiff asserts that she was unarmed, but a reasonable officer would not have known that at the time.")  Moreover, to the extent Gannon is arguing that he was not a danger because he was incapacitated by his extreme intoxication, Gannon has not come forward with any evidence that the officers knew or should have known this.  To the contrary, the video recording shows that Gannon was able to understand and comply with the officers' initial instructions to turn the vehicle off and remove the keys.  The video records also show that Gannon was able to communicate and interact with the officers prior to his extraction from the vehicle, repeating telling them to "f*** themsel[ves]"

17

and giving them the middle finger. Thus, even if the officers were aware that Gannon was intoxicated (and Gannon has pointed to no evidence that this is the case), a reasonable officer would not be expected to assume that Gannon was incapacitated to the point that he posed no danger, given that he had the ability to understand the officers' commands and verbally respond to those commands in a belligerent and defiant fashion.

Finally, although not argued by Gannon, the Court acknowledges that the fact that the vehicle was turned off and the keys were on the ground weighs somewhat against a finding of an immediate threat. However, these facts do not stand in isolation and must be considered along with all the other circumstances facing the officers at the time. Given the serious nature of the crimes of which Gannon was suspected, the dark conditions and uncertainty over whether Gannon was armed, and Gannon's belligerence and refusal to respond to the officers' repeated commands, the Court finds that, overall, it was objectively reasonable for Officer Gibbons to believe that Gibbons presented an immediate threat to officer safety.

The third *Graham* factor asks courts to consider whether the suspect "is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Gannon argues that this factor weighs in his favor because he was not actively resisting and, rather, was "just noncompliant in complying with orders from the police." (Doc. No. 30 at p. 9.) Officer Gibbons argues that Gannon has not come forward with any evidence that he was, in fact, only passively resisting. (Doc. No. 32 at pp. 4-5.) By contrast, Officer Gibbons maintains, Gannon "continued to resist through the course of the bites he received from Blek" and "the testimony of the arresting officers through their affidavits establishes that the use of force applied to Mr. Gannon was appropriate and correlated to his escalating and persistent resistance." (*Id*.)

18

The Sixth Circuit has "long distinguished active resistance by arrestees from passive resistance." *Jackson v. Washtenaw County*, 678 Fed. Appx. 302, 306 (6th Cir. 2017) (citing *Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015)). "Active resistance" can be characterized by physical force, a show of force, or verbal hostility coupled with failure to comply with police orders. *Id. See also Goodwin*, 781 F.3d at 323; *Rudlaff*, 791 F.3d at 641 (finding that active resistance includes "physically struggling with, threatening, or disobeying officers."); *Zuress*, 815 Fed. Appx. at 5 (quoting *Jackson*, 678 Fed. Appx. at 306). "Passive resistance," on the other hand, is generally shown by the lack of physical resistance or verbal antagonism. *See Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 498 (6th Cir. 2012); *Eldridge v. City of Warren*, 533 Fed. Appx. 529, 535 (6th Cir. 2013). The Sixth Circuit has held that "police violate the Fourth Amendment when they order a dog to bite a suspect who posed no threat to the officers' safety and was not resisting arrest or attempting to flee." *Hammond*, 825 Fed. Appx. at 347 (citing *Campbell*, 700 F.3d at 787-789.)

While a closer call, the Court finds that a Gannon was actively resisting when Officer Gibbons made the decision to deploy Blek to remove him from the vehicle. Although Gannon was not physically struggling with or threatening the officers, the video footage clearly shows that he was verbally hostile and repeatedly failed to comply with their multiple commands to exit the vehicle.[11] (Brenenstuhl Video at 1:13 to 3:50, 5:18 to 7:40.) Faced with similar circumstances, the Sixth Circuit has found that a suspect was "actively resisting." *See Zuress*, 815 Fed. Appx. at 5-6 ("Between exiting her vehicle at the second traffic stop and the deployment of the canine, plaintiff did not have

---

[11] As noted *supra*, where police dash-cam videos depict genuinely disputed facts, "we 'view [ ] the facts in the light depicted by the videotape[s]." *Rudlaff*, 791 F.3d at 638. *See also Standifer v. Lacon*, 587 Fed. Appx. 919, 920 (6th Cir. 2014) (in evaluating a summary judgment motion in a 1983 case, "we adopt the plaintiff's version of the facts except when the record 'blatantly contradict[s]' it 'so that no reasonable jury could believe it.'") (quoting *Scott*, 550 U.S. at 378-380.)

a physical struggle with the officers, and she did not orally threaten them. During that time, however, plaintiff argued with the officers and repeatedly failed to comply with their commands. We conclude that plaintiff's repeated non-compliance—coupled with her arguing with the officers—put her conduct just over the line into the active-resistance category.") *See also Ashford*, 951 F.3d at 802-803 ("True, Ashford had his hands up and was not making any aggressive moves. But that does not change two critical facts: (1) the officers could not control the scene with Ashford in the vehicle and (2) Ashford was refusing to exit the vehicle. If he was unwilling to budge on his own, the officers had little choice but to remove him.").

Likewise, here, Gannon argued with the officers, telling them to "go f*** themsel[ves]" and giving them the middle finger. Officer Gibbons showed Gannon the dog and told him at least nine times (over a period of at least two and a half minutes) to "get out of the car or you will get bit." (Brenenstuhl Video at 5:18 to 7:40). Gannon persistently and repeatedly refused to comply. (*Id*.) Taken together, the Court finds that Gannon's verbal hostility and persistent refusal to comply "puts him just over the line into the active-resistance category" for purposes of Officer Gibbons' decision to deploy Blek to remove Gannon from the vehicle. *See Zuress*, 815 Fed. Appx. at 5-6.

In addition, the Court finds that Gannon continued to actively resist while Officer Gibbons, Blek, and the other officers were trying to physically remove him from the vehicle. As noted above, Officer Gibbons avers that he opened the car door, gave Blek the command to bite Gannon, and physically attempted to pull Gannon out of the vehicle, first by his arm and then by his hair. (Gibbons Aff. at ¶¶ 21-24.) Although not entirely clear from the video footage, it appears to have taken approximately sixteen to twenty seconds to get Gannon out of the vehicle. (Brenenstuhl Video at 12:16 to 12:32: Montville Video from 10:06 to 10:24.) The Court assumes, for purposes of the instant

20

motion, that Blek had a bite hold on Gannon's left leg during this entire time period.  Officer Gibbons

avers that, while he and Blek were attempting to get Gannon out of the car, Gannon physically resisted

by holding on to the interior of the vehicle with his right hand and trying to push Gibbons' hand away

with his left hand.  (Gibbons Aff. at ¶¶ 23, 24.)  Officer Harvey also stated, in his police report, that

Gannon "resisted and held onto the steering wheel refusing to get out of the vehicle."  (Doc. No. 27-

1 at PageID# 196.)

Gannon has not come forward with any evidence to contest Officer Gibbons' and Officer

Harvey's statements that he was physically resisting the officers' efforts to extract him from the

vehicle.  Nor has he directed this Court's attention to any specific portion of the video recording that

he believes would support his unsupported assertion that he was "helpless" and passively non-

compliant.  Accordingly, the Court finds that Gannon actively resisted by holding on to the interior

of the vehicle/steering wheel while Officer Gibbons, Blek, and the other officers were attempting to

physically remove him from the vehicle.

The Court also notes that, in determining whether Officer Gibbons' use of Blek was

reasonable, "it's helpful to ask: what was the alternative?" *Ashford*, 951 F.3d at 802.  The Sixth

Circuit evaluated this very issue in a canine excessive force relating to a suspect that refused to exit

a running vehicle.  *Id*.  In *Ashford*, the court explained as follows:

> Granting that it was reasonable to seize Ashford, was it reasonable to seize him using
> a police dog? Or was sending an 80-pound Dutch Shepherd to drag him from his car
> simply too disproportionate? In answering these questions, it's helpful to ask: what
> was the alternative? To be sure, showing a potential gentler alternative is not enough
> (by itself) to make a use of force unreasonable. *See Dickerson*, 101 F.3d at 1160; *Lyons
> v. City of Xenia*, 417 F.3d 565, 576 (6th Cir. 2005) (opinion of Sutton, J.). But that
> doesn't mean that the absence of superior alternatives is irrelevant to the inquiry.
> Common sense says that a court should not condemn police officers' on-the-ground
> actions without some idea of what the officers should have done instead. *See Graham*,
> 490 U.S. at 396–97, 109 S.Ct. 1865.

21

>Here, Ashford has offered no suggestion (not counting his impractical you-grab-the-keys idea) for how Raby should have removed him from the vehicle. The simplest dog-free alternative would have been for one or more officers to pull Ashford from the vehicle (i.e., exactly what happened, just minus Ruger). **But while this would have spared Ashford some painful bite wounds, it would also have placed the officers at greater risk**. ***

*Id*. at 805-806 (emphasis added).

Likewise, here, Gannon has not suggested an alternative method of removing him from the vehicle or offered any evidence (expert or otherwise) that an alternative method would have been appropriate under the circumstances.[12] Here, the officers ordered Gannon to exit the vehicle numerous times and waited twelve minutes before deploying Blek to assist in physically removing him.  Gannon persistently refused, leaving the officers with "little choice but to remove him."  *Id*. at 803.  Although the officers in the instant case did not face precisely the same risk as the officers in *Ashford* (i.e., a suspect that refused to exit a vehicle that was still running), it is reasonable to believe that the officers herein would nonetheless have faced greater risk if they had attempted to remove Gannon by simply pulling him from the vehicle without Blek's assistance.  As noted above, it was dark and unclear whether Gannon was armed and/or whether there was any other (potentially armed) occupant(s) in the vehicle.  By using Blek, the officers were arguably able to subdue Gannon more quickly and distract him from reaching any potential weapons.  *See Robinette*, 854 F.2d at 914 (noting that "[t]he use of dogs can make it more likely that the officers can apprehend suspects without the risks attendant to the use of firearms in the darkness, thus, frequently enhancing the safety of the

---

[12] Notably, Gannon does not argue (and has presented no evidence) that Blek was inadequately trained or that he attacked without warning or command.

22

officers, bystanders, and the suspect."); *Matthews v. Jones*, 35 F.3d 1046, 1052 (6th Cir. 1994) (same).

Given the Court's evaluation of the *Graham* factors, and considering the totality of the circumstances, the Court finds that it was reasonable to deploy Blek because Gannon was suspected of serious crimes (including two felonies), potentially armed, verbally hostile to the officers, and refusing to comply with the officers' repeated commands and warnings. Accordingly, the Court finds that Officer Gibbons' decision to deploy Blek and use him to assist in physically removing Gannon from the vehicle did not constitute a constitutional violation. Officer Gibbons is entitled to qualified immunity with respect to this claim.

### ii.    Use of Blek while Gannon was on the Ground

The Court next considers whether Officer Gibbons unreasonably prolonged the use of force by allowing Blek to continue biting Gannon once he was out of the vehicle and on the ground. The Court finds that the first and second *Graham* factors weigh in Officer Gibbons' favor with regard to this phase of the arrest, for the same reasons discussed at length above. Specifically, Gannon was wanted in connection with several serious felony charges, he had been verbally belligerent and repeatedly refused to comply with officer commands, and it was unknown whether he was armed. Thus, the Court finds that the severity of the crime and immediate threat factors weigh in favor of Officer Gibbons with respect to Blek's continued hold on Gannon after he was removed from the vehicle.

With regard to the third factor (i.e., whether Gannon was actively resisting), Gannon's briefing can be read as asserting that he was not, in fact, actively resisting at this point and, therefore,

23

the continued use of a bite hold was excessive and unreasonable. (Doc. No. 30.) Officer Gibbons does not directly address this issue in his Reply Brief.

The Sixth Circuit has held that "it is possible for a 'delay in calling off [a police] dog . . . to rise to the level of an unreasonable seizure.'" *Zuress,* 815 Fed. Appx. at 7 (quoting *Greco v. Livingston Cty.*, 774 F.3d 1061, 1064 (6th Cir. 2014)). *See also Ashford*, 951 F.3d at 803-804. Moreover, "'a line of Sixth Circuit cases holds that the use of non-lethal, temporarily incapacitating force on a handcuffed suspect who no longer poses a safety threat, flight risk, and/or is not resisting arrest constitutes excessive force.'" *Austin v. Redford Twp. Police Dept.*, 690 F.3d 490, 497-498 (6th Cir. 2012) (discussing use of a taser) (quoting *Michaels v. City of Vermillion,* 539 F.Supp.2d 975, 985–86 (N.D. Ohio 2008) (citing cases). "Absent some compelling justification—such as the potential escape of a dangerous criminal or the threat of immediate harm—the use of such a weapon on a non-resistant person is unreasonable." *Kijowski v. City of Niles*, 372 Fed. Appx. 595, 600 (6th Cir. 2010) (discussing use of a taser).

Evaluation of this issue requires a careful consideration of what happened just after Gannon was pulled from the vehicle. As noted above, Gannon has no memory of the incident and, thus, the Court does not have any testimony or other direct evidence from him regarding this phase of his arrest. And, unfortunately, the video footage does not clearly show what either Gannon, Officer Gibbons, or Blek are doing while Gannon is on the ground and the officers are trying to handcuff him. It is undisputed, however, that when Gannon came out of the vehicle, Blek lost his grip on Gannon's left thigh and bit Gannon on his right thigh. Once Gannon is out of the vehicle, several officers (including Officer Brenenstuhl) focused on securing Gannon. Officer Brenenstuhl can be heard saying "stop fighting" and "don't resist" within seconds of Gannon hitting the ground.

(Brenenstuhl video at 12:36, 12:42.) Approximately five seconds after Brenenstuhl advised Gannon to stop resisting, an officer can be heard saying "we got him."  (*Id*. at 12:47.)  About twenty seconds later, a slight "click" can be heard and an officer says "secured."  (*Id*. at 13:09.)  Meanwhile, while the officers were attempting to handcuff and secure Gannon, another officer can be heard saying "get the dog."  (*Id*. at 12:44.)  Five seconds later, Officer Gibbons can be heard saying "I got the dog." (*Id*. at 12:50.)  Almost forty seconds after that, Officer Gibbons can heard giving what appear to be dog commands.[13]  (*Id.* at 13:29.)

It is not clear at what precise point in this confusion and activity that Officer Gibbons released Blek from his hold on Gannon's right leg.  In his Affidavit, Officer Gibbons states only that he released Blek from the bite "when I was advised that Mr. Gannon was secured in handcuffs by the other officers and no longer resisting."  (Gibbons Aff. at ¶ 26.)  The Medina Officers' Police Report (Doc. No. 27-1) does not shed any light on how long Blek was allowed to continue his bite hold on Gannon once he was out of the vehicle and on the ground.

The Court first finds that it was reasonable for Officer Gibbons to have Blek maintain his bite hold on Gannon before he was handcuffed.  Officer Gibbons has come forward with evidence that Gannon was actively resisting, i.e., the video recording in which Officer Brenenstuhl can be heard saying "stop fighting" and "don't resist."  While Gannon states (summarily) in his briefing that he was "helpless" and passively resisting, he has not come forward with any evidence to support this assertion.  Nor does he make any reasoned argument that the video recording should be construed as showing that he was passive during this phase of the arrest.  Accordingly, and given the potential

---

[13] It is not entirely clear what Officer Gibbons is saying.  Phonetically, it sounds like "foose, foose."  None of the parties to this action provide any evidence regarding what this means (or what language it is) or how Blek was supposed to respond.

dangers posed by Gannon (including the possibility that he was armed), the Court finds that it was objectively reasonable for Officer Gibbons to have Blek maintain his bite hold until Gannon was handcuffed.  This corresponds to approximately the 13:09 minute mark on the Brenenstuhl Video when an unidentified officer can be heard saying "secured."

As noted above, it is not clear when Officer Gibbons released Blek's bite hold.  Given Officer Gibbons' statement that he released Blek "when he was advised that Mr. Gannon was secured in handcuffs and no longer resisting," (Gibbons Aff. at ¶ 26), it is reasonable to assume that Officer Gibbons released Blek immediately after another officer in the video recording is heard saying the word "secured."  However, for purposes of the instant Motion only, the Court will draw all reasonable inferences in Gannon's favor and presume that Blek continued to maintain his bite hold on Gannon's right thigh after Gannon was handcuffed, until the moment when Officer Gibbons can be heard issuing a command to Blek.  This corresponds to approximately the 13:29 minute mark on the Brenenstuhl Video, which is twenty seconds after the officer is heard saying "secured."  Thus, and in the absence of any meaningful or specific argument from Gannon on this point, the Court presumes that Blek maintained his hold on Gannon's right thigh for approximately twenty seconds after he was handcuffed.

Gannon has not sufficiently argued, or cited any legal authority, that allowing a bite hold to continue for approximately twenty seconds under the circumstances presented constitutes a constitutional violation under Sixth Circuit precedent.  To the contrary, the Sixth Circuit has upheld the granting of qualified immunity where there has been a slightly less, but similar delay.  *See, e.g., Zuress*, 815 Fed. Appx. at 7 (finding no unreasonable use of force when dog bite lasted about eleven seconds).  At most, one could argue that Officer Gibbons could have released Blek's bite hold a few

26

seconds sooner. "But that kind of fine-sliced judgment call amid 'tense, uncertain, and rapidly evolving' circumstances just isn't the stuff of a Fourth Amendment violation." *Ashford*, 951 F.3d at 804. And, even assuming it was a constitutional violation to allow Blek to maintain a hold on Gannon's leg for this length of time, Gannon has not demonstrated that it is a clearly established violation.  Indeed, Gannon does not cite and apply any Supreme Court or Sixth Circuit authority to the facts of this case to show that Officer Gibbons should have known his use of force was unreasonably prolonged under the circumstances presented.

Accordingly, the Court finds that Officer Gibbons' decision to maintain Blek's bite hold after Gannon was removed from the vehicle did not constitute a constitutional violation and, even if it did, Gannon has not shown that it amounted to violation of a clearly established right.  Officer Gibbons is therefore entitled to qualified immunity with respect to this claim.

### 2.  *Monell* Claims

Gannon alleges that Montville Township has a policy, custom, or practice of using excessive force and unnecessary use of K9s to "intimidate, subdue, harm, and injure individuals who posed no threat to officers during traffic stops, detention, and arrests."  (Doc. No. 1 at ¶ 13.)  Gannon further alleges that Montville Township (1) condoned and ratified the policy and practices of use of excessive force, including the use of K9s, and (2) were negligent and the training and appropriate use of K9s. (*Id*. at ¶ 14.)

In *Monell v. Dep't of Soc. Services of City of New York*, the Supreme Court held that § 1983 "imposes liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights." 436 U.S. 658, 692 (1978).  However, "[t]here can be no liability under *Monell* without an underlying constitutional violation." *Robertson v. Lucas*, 753 F.3d

606, 622 (6th Cir. 2014); *accord France v. Lucas*, 836 F.3d 612, 631 (6th Cir. 2016).  Because the Court has found that Officer Gibbons is entitled to summary judgment and that no underlying constitutional violation occurred, Montville Township is entitled to summary judgment on Gannon's *Monell* claims.[14]  *See also Shanaberg*, 936 F.3d at 457 (noting that "there can be no link between a policy and a constitutional violation when there is no violation to begin with.")

## B.    Section 1983 Claims against the Medina Township Defendants

In Count II, Gannon alleges a § 1983 failure to intervene claim against Medina Township Police Officers Brenenstuhl and Harvey.  (Doc. No. 1 at ¶ 12.)  Specifically, Gannon alleges that "Defendant Brenenstuhl and Defendant Harvey stood by and did nothing to stop the K9 from biting Plaintiff while he was in their control and custody."  (*Id*.)  Gannon also alleges Monell claims that Defendant Medina Township (1) had a policy, custom, and practice of using excessive force on individuals during traffic stops, detentions, and arrests; and (2) condoned and ratified the policy and practices of the use of excessive force, including the use of K9s.  (*Id*. at ¶¶ 13, 14.)

As Officers Brenenstuhl and Harvey correctly note, Gannon does not sufficiently argue or allege (either in his Complaint or his summary judgment briefing) that Defendants Brenenstuhl and/or Harvey personally used excessive force on him at any point during the traffic stop at issue.  Rather, Gannon's claim against these Defendants is solely that they improperly failed to intervene when Officer Gibbons allegedly used excessive force in deploying Blek.

---

[14] For this same reason, Defendant Gibbons in his official capacity is also entitled to summary judgment on each of Gannon's § 1983 claims.  *See Kraemer v. Luttrell*, 189 Fed. Appx. 361, 366 (6th Cir. 2006) ("Suing a municipal officer in his official capacity for a constitutional violation pursuant to 42 U.S.C. § 1983 is the same as suing the municipality itself, and thus a successful suit against a municipal officer in his official capacity must meet the requirements for municipal liability stated in [*Monell*].")

However, as discussed at length above, this Court has found that Officer Gibbons' use of force in deploying Blek (both to remove Gannon from the vehicle and to control Gannon after he was on the ground) was objectively reasonable. Because Officer Gibbons' use of force was not a constitutional violation, Gannon's failure to intervene claim against Officers Brenenstuhl and Harvey fails. *See Shanaberg*, 936 F.3d at 457 (noting that "because the tasing was justified, a viable claim for failure to intervene to prevent the tasing does not exist.")

Likewise, the Court finds that Gannon's Monell claims against Medina Township fail. These claims are premised on Officer Gibbons' alleged use of excessive force and/or Officer Brenenstuhl and Harvey's failure to intervene in Gibbon's alleged use of excessive force. Because the Court has found that Officer Gibbons is entitled to summary judgment and that no underlying constitutional violation occurred, Medina Township is entitled to summary judgment on Gannon's *Monell* claim as well.

Accordingly, and for all the reasons set forth above, the Medina Township Defendants are entitled to summary judgment in their favor with respect to Gannon's federal claims.

## IV. State Claims

### A. Assault and Battery (Count III)

In Count III, Gannon alleges a state law claim for assault and battery. Specifically, Gannon alleges that "Defendants intentionally, wantonly, recklessly, and without privilege, justification, or consent, engaged in acts which constitute the tort of assault and battery." (Doc. No. 1 at ¶ 26.)

#### 1. Officer Gibbons

Officer Gibbons argues that he is entitled to summary judgment with respect to this claim because it is barred by the one-year statute of limitations set forth in Ohio Rev. Code § 2305.111.

29

(Doc. No. 23 at pp. 18-19.)  Specifically, Officer Gibbons argues that this claim is untimely because the alleged assault and battery occurred on March 16, 2019 but the Complaint was not filed until nearly two years later, on March 15, 2021.  (*Id*.)  Officer Gibbons further argues that, even assuming Gannon did not know Gibbons' identity at the time of the traffic stop itself, he "reasonably should have learned Officer Gibbons' identity no later than April 19, 2019, when Mr. Gannon was arraigned and appeared in court pursuant to his charges."  (*Id*.)  As the Complaint was filed more than one year after April 19, 2019, the claim is barred by the applicable statute of limitations.

Gannon does not acknowledge or address this argument at any point in his brief in opposition. (Doc. No. 30.)

As an initial matter, the Court finds that Gannon has abandoned this claim and summary judgment in favor of the Montville Township Defendants is thus appropriate.  As the Sixth Circuit has recognized, its "jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Michigan, Inc*., 545 Fed. Appx 368, 372 (6th Cir. 2013); *see also Wierengo v. Akal Sec., Inc*., 580 Fed. Appx 364, 369 n.1 (6th Cir. 2014) ("Akal moved for summary judgment on Wierengo's federal-and state-law claims. Wierengo did not discuss her state-law claims in her response brief, and the district court held that they were abandoned. We agree."); *Hicks v. Concorde Career Coll*., 449 Fed. Appx 484, 487 (6th Cir. 2011) ("The district court properly declined to consider the merits of this claim because Hicks failed to address it in either his response to the summary judgment motion or his response to Concorde's reply brief.").

Moreover, even if the Court were to consider the merits of Gannon's claim, the Court agrees that it is time-barred.  Under Ohio law, a claim for assault and battery must be brought within one

year after the cause of action accrues. Ohio Rev. C. § 2305.111(B).  Ohio's statute of limitations on

assault and battery claims provides:

> (B) Except as provided in section 2305.115 of the Revised Code and subject to division (C) of this section, an action for assault or battery shall be brought within one year after the cause of the action accrues.  For purposes of this section, a cause of action for assault or battery accrues upon the later of the following:
>
> (1) The date on which the alleged assault or battery occurred;
>
> (2) If the plaintiff did not know the identity of the person who allegedly committed the assault or battery on the date on which it allegedly occurred, the earlier of the following dates:
>
>> (a) The date on which the plaintiff learns the identity of that person;
>>
>> (b) The date on which, by the exercise of reasonable diligence, the plaintiff should have learned the identity of that person.

*Id*.  An assault and battery claim brought outside the statute's one-year limit is barred. *Kaschalk v.
Parker*, 2016 WL 3668161 at *2 (N.D. Ohio July 11, 2016) (granting judgment on the pleadings to
defendants because the plaintiff's claims for battery and assault were brought more than a year after
the alleged assault and battery occurred).  *See also Spencer v. Cleveland Clinic*, 2022 WL 2954175
at * 12 (N.D. Ohio July 26, 2022).

Here, Gannon does not contest that, at the very latest, he should have learned Officer Gibbons'
identity by no later than April 19, 2019.  Nor does he offer any other reason or argument that the
limitations period should be tolled or otherwise begin to run on a later date.  Accordingly, and in the
absence of any meaningful argument to the contrary, the Court finds that Gannon's assault and battery
claim against Officer Gibbons is time-barred.

## 2.     Officers Brenenstuhl and Harvey

Officers Brenenstuhl and Harvey argue that they are entitled to summary judgment in their favor with respect to Gannon's assault and battery claim because "Plaintiff makes no allegations that [they] inappropriately threatened or made contact with Plaintiff." (Doc. No. 27 at pp. 12-13.)  They maintain that Gannon's only claims against them stem from an alleged failure to intervene, which (even if true) does not satisfy the elements of assault and battery under Ohio law. (*Id*.) Finally, Officers Brenenstuhl and Harvey argue that they are statutorily immune from suit under Ohio Rev. Code Chapter 2744. (*Id*. at pp. 13-16.) Gannon does not acknowledge or address either of these arguments in his Brief in Opposition.  (Doc. No. 31.)

As Gannon failed to respond, the Court finds that he abandoned this claim.  *See Brown*, 545 Fed. Appx at 372; *Wierengo*, 580 Fed. Appx at 369 n.1; *Hicks*, 449 Fed. Appx at 487.  Moreover, even if the Court were to address it, the Court would find Defendants are entitled to summary judgment in their favor for several reasons.  First, although not raised by Officers Brenenstuhl and Harvey in their Motion, the Court finds that Gannon's assault and battery claims against them are time-barred for the same reasons set forth above. [15] Second, even if these claims were not time-barred, the Court finds that Gannon's claims fail because he has neither argued nor come forward with any evidence that Officer Brehenstuhl's and/or Officer Harvey's actions satisfy the elements of assault and battery under Ohio law.  *See Howse*, 953 F.3d at 410 ("To succeed on a claim for assault and battery under Ohio law, a plaintiff must show: "(1) that the officers acted with an intent to cause harmful or offensive contact and (2) that such contact occurred (that's battery) or that he thought that such contact would occur (that's assault).") (citing *Love v. City of Port Clinton*, 37 Ohio St.3d 98,

---

[15] The Court notes that the Medina Township Defendants plead statute of limitations as an affirmative defense in their Answer.  (Doc. No. 7 at p. 4.)

524 N.E.2d 166, 167 (1988); *Smith v. John Deere Co*., 83 Ohio App.3d 398, 614 N.E.2d 1148, 1154 (1993)).

Third, and finally, Officers Brenenstuhl and Harvey argue that they are immune from suit under Ohio Rev. Code § 2744.03(A)(6).  That provision creates "a presumption of immunity" that can be overcome only in a handful of circumstances.  *Hoffman v. Gallia Cty. Sheriff's Office*, 103 N.E.3d 1, 13 (Ohio Ct. App. 2017).  Here, Gannon "cannot proceed to trial on his assault-and-battery claim because he hasn't challenged the officers' statutory immunity." *Howse*, 953 F.3d at 410.  "[T]he burden necessary to deny immunity to [law enforcement] officers is onerous." *Argabrite v. Neer*, 149 Ohio St.3d 349, 75 N.E.3d 161, 169 (2016).  Gannon offers nothing to meet that burden.  He has not argued that any exception to immunity applies nor has he cited a single Ohio case to support such an argument.  Because Gannon makes no argument on the matter, the Court concludes that Officers Brenenstuhl and Harvey are entitled to statutory immunity.[16] *See Howse*, 953 F.3d at 410.

### 3. Conclusion

Accordingly, the Medina Township and Montville Township Defendants are entitled to summary judgment in their favor with respect to Gannon's assault and battery claim.

### B. Intentional Infliction of Emotional Distress (Count I)

Lastly, in Count I, Gannon alleges a claim of intentional infliction of emotional distress.  (Doc. No. 1 at ¶¶ 17-19.)  This claim is thread-bare, to say the least.  Therein, Gannon alleges only that "Defendants' actions against Plaintiff resulted in the intentional infliction of emotional distress." (*Id*. at ¶ 18.)

---

[16] Likewise, Gannon has failed to make any argument that Medina Township is not immune under Ohio Rev. Code Chapter 2744.  Accordingly, to the extent Gannon's assault and battery claim is directed towards Medina Township, that claim also fails.

33

The Montville Township Defendants argue (summarily) that this claim is barred by the applicable statute of limitations.  (Doc. No. 23 at p. 19.)  The Medina Township Defendants argue that they are entitled to immunity with respect to this claim under Ohio Rev. Code Chapter 2744. (Doc. No. 27 at pp. 13-17.) Once again, Gannon fails to acknowledge or address Defendants' arguments.  (Doc. Nos. 30, 31.)

The Court finds that Gannon's claim fails.  Gannon failed to sufficiently plead this claim in the Complaint, and, further, abandoned it entirely in his summary judgment briefing.  Moreover, although the Medina Township Defendants have argued they are statutorily immune from suit, Gannon has failed to argue that any exception to immunity applies.  Nor has he cited a single Ohio case to support such an argument. Because Gannon makes no argument on the matter, the Medina Township Defendants are entitled to statutory immunity. *See Howse*, 953 F.3d at 410.

Lastly, even if the Court were to consider the claim on the merits, the Court finds that Gannon has failed to come forward with sufficient evidence to create a genuine issue of material fact with respect to any of the Defendants.  In order to succeed on a claim of intentional infliction of emotional distress under Ohio law, a plaintiff must demonstrate that: (1) the defendant intended to caused emotional distress, or knew or should have known that his conduct would result in serious emotional distress to the plaintiff; (2) the defendant's conduct was outrageous and extreme; (3) the defendant's conduct was the proximate cause of plaintiff's psychic injuries; and (4) the plaintiff's emotional distress was serious, and of such a nature that no reasonable person could be expected to endure it. *Bolander v. BP Oil Co*., 128 Fed. Appx. 412, 419 (6th Cir. 2005) (citing *Ekunsumi v. Cincinnati Restoration, Inc*., 698 N.E.2d 503 (Ohio Ct.App.1997) and *Yeager v. Local Union 20*, 453 N.E.2d 666 (1983), *abrogated on other grounds by, Welling v. Weinfeld*, 113 Ohio St.3d 464 (2007)).

34

Conduct is "extreme and outrageous" when it "go[es] beyond all possible bounds of decency, and [would] be regarded as atrocious, and utterly intolerable in a civilized community." *See Yeager*, 453 N.E.2d at 671.

Here, the Court has found that Officer Gibbons' use of force was objectively reasonable. Thus, and in the absence of any meaningful argument to the contrary, the Court cannot find that there is a genuine issue of material fact that his conduct was "extreme and outrageous" or "goes beyond all possible bounds of decency."  Nor is there a genuine issue of material fact that Officers Brenenstuhl and Harvey's alleged failure to intervene was "extreme and outrageous" for purposes of this claim.

Accordingly, and for all the reasons set forth above, the Medina Township and Montville Township Defendants are entitled to summary judgment in their favor with respect to Gannon's intentional infliction of emotional distress claim.

## V.      Conclusion

For the reasons set forth above, the Montville Township Defendants' Motion for Summary Judgment (Doc. No. 23) is GRANTED.   The Medina Township Defendants' Motion for Summary Judgment (Doc. No. 27) is GRANTED.

**IT IS SO ORDERED.**


     *s/Pamela A. Barker*
     PAMELA A. BARKER
Date:  August 1, 2022     U. S. DISTRICT JUDGE